**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| New York City, Local 246, S.E.I.U. Welfare Benefits Fund; New York City, Local 246, S.E.I.U. Retirees Welfare Benefits Fund; Teamsters Local 237 Welfare Fund; Teamsters Local 237 Retirees Benefit Fund; Teamsters Local 237 Brentwood School District Health and Welfare Trust Fund; Teamsters Local 237 North Babylon School District Health and Welfare Trust Fund; Teamsters Local 237 Suffolk Regional Off-Track Betting Corp. Health and Welfare Trust Fund; Teamsters Plainview Old Bethpage Central School District Health and Welfare Trust Fund; Uniformed Sanitationmen's Association Security Benefit Fund; and Uniformed Sanitationmen's Association Retirees Welfare Fund; individually and on behalf of all others similarly situated, | Case No. 1:17-cv-02467 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| Lannett Company, Inc., Mylan Pharmaceuticals, Inc., and Sandoz, Inc., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................................... 5

III.    THE PARTIES....................................................................................... 7

        A.      Plaintiffs ..................................................................................... 7

        B.      Defendants ................................................................................ 11

        C.      Agents and Co-Conspirators ................................................... 11

IV.     CLASS ACTION ALLEGATIONS ....................................................... 12

V.      FACTUAL ALLEGATIONS ................................................................. 15

        A.      Relevant Market For Generic Levothyroxine ........................ 15

        B.      The Structure Of The Generic Levothyroxine Market Facilitated
                Defendants' Collusion ............................................................ 17

        C.      Defendants Conspired To Increase Prices of Generic Levothyroxine
                Significantly Above Competitive Levels................................. 21

        D.      Defendants Are Under Civil And Criminal Investigation For Price-Fixing
                Generic Drugs .......................................................................... 30

FIRST CLAIM FOR RELIEF  VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
        (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE INJUNCTIVE
        RELIEF CLASS AGAINST ALL DEFENDANTS)....................................... 32

SECOND CLAIM FOR RELIEF  VIOLATION OF STATE ANTITRUST LAWS (ON
        BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS AGAINST ALL
        DEFENDANTS) ............................................................................................ 33

THIRD CLAIM FOR RELIEF  VIOLATION OF STATE CONSUMER PROTECTION
        STATUTES (ON BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS
        AGAINST ALL DEFENDANTS)................................................................... 53

FOURTH CLAIM FOR RELIEF  UNJUST ENRICHMENT (ON BEHALF OF
        PLAINTIFFS AND THE DAMAGES CLASS AGAINST ALL DEFENDANTS)....... 63

VI.     PRAYER FOR RELIEF ....................................................................... 64

VII.    JURY DEMAND................................................................................... 65

New York City, Local 246, S.E.I.U. Welfare Benefits Fund; New York City, Local 246, S.E.I.U. Retirees Welfare Benefits Fund; Teamsters Local 237 Welfare Fund; Teamsters Local 237 Retirees Benefit Fund; Teamsters Local 237 Brentwood School District Health and Welfare Trust Fund; Teamsters Local 237 North Babylon School District Health and Welfare Trust Fund; Teamsters Local 237 Suffolk Regional Off-Track Betting Corp. Health and Welfare Trust Fund; Teamsters Plainview Old Bethpage Central School District Health and Welfare Trust Fund; Uniformed Sanitationmen's Association Security Benefit Fund; and Uniformed Sanitationmen's Association Retirees Welfare Fund; (collectively, "Plaintiffs"), individually and on behalf of others similarly situated, allege a conspiracy among Lannett Company, Inc. ("Lannett"), Mylan Pharmaceuticals, Inc. ("Mylan"), and Sandoz, Inc. ("Sandoz") (collectively, "Defendants") to increase the prices of generic levothyroxine.

I.    **SUMMARY OF THE ACTION**

1.    One of the most pressing public policy issues of our time is the rising costs of medical care.  Historically, generic drug competition provided life-saving medications to patients at a reasonable price, bringing down overall health care costs.  Generic drugs, unlike branded drugs protected by patents, may be freely manufactured and distributed once approved by the United States Food & Drug Administration.  Generic drug manufacturers do not face the same research and development costs as innovator pharmaceutical companies, and they are unable to lawfully create or protect monopolies because they do not own patents covering their products. For decades, generic drug manufacturers competed to provide safe, effective, and inexpensive medications. The result was vigorous competition, appropriately slim profit margins, and prices that tracked manufacturer costs and patient demand.  Patients and others in the pharmaceutical supply chain benefited from competition and low prices.

2.      In recent years, however, the market for generic drugs has been turned on its head.  Prices for hundreds of generic drugs have doubled, tripled, or increased by even larger amounts—in some cases, ten times or more—with no apparent market explanation.  These price increases were unprecedented, increasing costs to patients and others who indirectly purchased, paid, or were reimbursed for generic drugs intended for use by themselves, their families, or their members, participants, employees, or insureds.  The price increases have been so severe that many patients have been forced to give up life-saving medication they were previously able to afford.

3.      These dramatic price increases did not result from independent market forces, such as increased costs or increased demand.  Instead, in many instances, these increased prices were the consequence of unlawful collusion among generic drug manufacturers who chose illicit profits over the health of patients who rely on their products.

4.      The inexplicable and skyrocketing prices of generic drugs led to several government investigations, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and at least twenty States.  The DOJ and at least twenty State Attorney Generals are currently conducting a wide-ranging investigation into collusion among generic drug companies.  Many generic drug companies, including Defendants Lannett, Mylan, and Sandoz, have received federal grand jury subpoenas.  These investigations are reported to cover more than a dozen companies and over two dozen drugs.

5.      It has also been reported that, over the summer of 2016, a generic drug company sought leniency from the DOJ in exchange for reporting a conspiracy to fix the prices of generic drugs.  To avail itself of the DOJ's Corporate Leniency Policy, a company must confess to its

participation in an unlawful conspiracy with candor and completeness, and provide full, continuing, and complete cooperation that advances the DOJ in its investigation. Thus, it appears that at least one generic drug company has already confessed to the existence of an antitrust conspiracy and its participation in it.

6.     On December 14, 2016, twenty States filed a civil case against six generic drug manufacturers, including defendant Mylan. The States allege that their investigation, which began in July 2014 and "is still ongoing," "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." The States' "initial civil action" concerned two generic drugs: Doxycycline Hyclate Delayed Release and Gyburide. The States have made clear that the evidence of wrongdoing they have uncovered extends far beyond the defendants and drugs identified in their "initial civil action." The Attorney General of Connecticut, George C. Jepson, whose office led the States' antitrust investigation, told the New York Times: "We believe that this is just the tip of the iceberg. I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

7.     Also on December 14, 2016, the DOJ brought felony charges against two former senior generic pharmaceutical executives for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs. The DOJ alleges that Jeffrey Glazer, the former CEO of Heritage Pharmaceuticals, and Jason Malek, the former president of the same company, conspired to fix prices, rig bids, and allocate customers for doxycycline hyclate, an antibiotic. The DOJ also alleges that Glazer and Malek conspired to fix prices and allocate customers for glyburide, a medicine used to treat diabetes. The DOJ alleges that the "doxycycline hyclate

conspiracy" began in approximately April 2013 and continued until at least December 2015. The DOJ alleges that the "glyburide conspiracy" began in approximately April 2014 and continued until at least December 2015.

8.    Brent Snyder, Deputy Assistant Attorney General for the DOJ, said that "these two executives sought to enrich themselves at the expense of the sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines."

9.    Special Agent in Charge Michael Harpster of the Federal Bureau of Investigation's Philadelphia Division stated: "Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency—and very clearly breaks the law."  He continued: "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

10.    The DOJ's charges are the result of an ongoing DOJ investigation into price fixing, bid rigging, and other anticompetitive conduct in the generic pharmaceutical industry.

11.    This action addresses a conspiracy to fix the prices of generic levothyroxine, the primary treatment for hypothyroidism.  Hypothyroidism is a condition in which the thyroid gland fails to produce sufficient levels of thyroid hormone.  Its symptoms include fatigue, weakness, weight gain, muscle cramps, depression, and memory loss.  Untreated hypothyroidism may lead to obesity, infertility, heart disease, and other health problems.  The World Health Organization includes levothyroxine on its list of essential medicines necessary to meet the minimum needs of even a basic health care system.  Levothyroxine has been manufactured and distributed widely

1343920.7

since at least the 1950s, and it is among the most widely-prescribed medications in the United States (in 2014, for instance, levothyroxine was the most prescribed drug in the United States, with 119.9 million dispensed prescriptions). Any patent protection on levothyroxine has long-since expired.

12.     Lannett, Mylan, and Sandoz control the United States market for generic levothyroxine. All three companies have received grand jury subpoenas and are under active investigation by the DOJ. Until 2013, Defendants competed, resulting in competitive and stable low prices. But beginning in 2013, Defendants agreed to increase prices and eliminate competition. Their conspiracy succeeded in increasing generic levothyroxine prices significantly. According to National Average Drug Acquisition ("NADAC") data, the overall dollar value of generic levothyroxine sales increased from $166.7 million in 2012 to $541.3 million in 2016. Defendants' conspiracy restrained trade and is *per se* unlawful under federal and state law.

## II.     JURISDICTION AND VENUE

13.     Plaintiffs bring this action to obtain injunctive and declaratory relief, as well as costs of suit and attorneys' fees, arising from Defendants' violations of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also seek injunctive and declaratory relief, costs of suit and attorneys' fees, and damages, arising from Defendants' violations of state laws, pursuant to Plaintiffs' second through fourth claims for relief, as set forth below.

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1367. This Court also has jurisdiction pursuant to 15 U.S.C. § 26.

15.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the

aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of Plaintiffs is different from that of any defendant.  The $5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

16.    This Court has personal jurisdiction over Defendants pursuant to the Clayton Act, 15 U.S.C. § 22, and the New York long-arm statute, N.Y. C.P.L.R. § 302, because Defendants transact substantial business within the state of New York, including in this district, and Defendants' conspiracy has injured at least many thousands of New York citizens who have overpaid for necessary medications, including in this district.  Defendants regularly conduct and solicit business in New York, including in this district, derive substantial revenue from products that are used and consumed in New York, including in this district, and derive substantial revenue from interstate commerce.

17.    Venue is proper under the Clayton Act because Defendants knowingly transact a large volume of business in New York in the form of sales of pharmaceuticals, including generic levothyroxine.  15 U.S.C. § 22.

18.    Venue is also appropriate in this district under 28 U.S.C. § 1391(b) and (c). During the Class Period, Defendants transacted business, were found, or had agents in this district and a significant amount of affected interstate trade and commerce was carried out in this district.

19.    The activities of the Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

20.    By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the

Classes (as defined below). Defendants, directly and through their agents, engaged in a conspiracy affecting all states to fix and inflate prices of generic levothyroxine, which unreasonably restrained trade and adversely affected the market for generic levothyroxine.

## III.    THE PARTIES

### A.    Plaintiffs

21.    Plaintiffs New York City, Local 246, S.E.I.U. Welfare Benefits Fund ("Local 246 Welfare Fund") and New York City, Local 246, S.E.I.U. Retirees Welfare Benefits Fund ("Local 246 Retiree Fund") (together, "Local 246 Funds") are welfare benefit plans covering automotive service trades employees of the City of New York in 23 different titles, retirees from those titles, and the families of active employees and retirees. The Funds' principal place of business is 217 Broadway, Suite 501, New York, NY 10007. Employees in the titles covered by the Funds are represented for collective bargaining purposes by New York City SEIU Local 246, AFL-CIO ("Union"). Union members maintain and repair one of the largest non-military motor fleets in the world—more than 30,000 vehicles for New York City's 20 different agencies, such as Police, Fire, Sanitation, and Transportation Departments. Throughout the Class Period, the Local 246 Funds indirectly purchased, paid, and reimbursed for generic levothyroxine intended for consumption by its members, retirees, and their families throughout the United States, including but not limited to New York, New Jersey, Florida, Pennsylvania, North Carolina, Arizona, and Texas.

22.    Plaintiffs Teamsters Local 237 Welfare Fund ("Local 237 Welfare Fund") and Teamsters Local 237 Retirees Benefit Fund ("Local 237 Retirees Fund") (together collectively referred to as the "Local 237 Funds") are welfare benefit plans covering a variety of employees of the various agencies of the City of New York as well as the New York City Health and Hospitals Corporation (HHC), New York City Housing Authority (NYCHA), and City

University of New York,  in over 200 titles ranging from Special Officers to X-ray Technicians,

Plasterers, Elevator Mechanics, Roofers, Maintenance Workers, etc.,  retirees from those titles

and the families of active employees and retirees.  The Funds' principal place of business is 216

West 14th Street, New York, NY 10011.  Employees in the titles covered by the Funds are

represented for collective bargaining purposes by City Employees Union Local 237, IBT

("Union").  Union members include white collar and blue collar workers, technicians and

professionals who respond to life-threatening emergencies in public schools, city hospitals, on

the waterways and public pools.  They maintain NYC's public housing system, run senior citizen

centers, and prepare NYC's Jacob Javits Convention Center for hundreds of trade shows and

thousands of visitors. They deliver meals to the home-bound elderly, and snowplow frozen roads

and airports at 3 a.m. on Long Island.  They also prepare meals for prison inmates and in city

hospitals, treat drug and alcohol problems, counsel troubled teenagers and assist the disabled,

among other jobs.  Throughout the Class Period, Local 237 Welfare Fund indirectly purchased,

paid, and reimbursed for generic levothyroxine intended for consumption by its members,

retirees, and their families throughout the United States, including but not limited to New York,

California, Connecticut, Delaware, Florida, Georgia, Missouri, North Carolina, New Jersey,

Ohio, Pennsylvania, Puerto Rico, South Carolina, Virginia, and Wisconsin.  Throughout the

Class Period, Local 237 Retirees Fund indirectly purchased, paid, and reimbursed for generic

levothyroxine intended for consumption by its members, retirees, and their families throughout

the United States, including but not limited to New York, Alabama, Arkansas, Arizona,

California, Colorado, Connecticut, the District of Columbia, Delaware, Florida, Georgia, Illinois,

Indiana, Louisiana, Massachusetts, Maryland, Missouri, Mississippi, North Carolina, New

Hampshire, New Jersey, New Mexico, Nevada, Ohio, Pennsylvania, Puerto Rico, South
Carolina, Tennessee, Texas, Utah, Virginia, and Vermont.

23.      Plaintiffs Teamsters Local 237 Brentwood School District Health and Welfare
Trust Fund ("Local 237 Brentwood Fund"), Teamsters Local 237 North Babylon School District
Health and Welfare Trust Fund ("Local 237 Babylon Fund"), and Teamsters Plainview Old
Bethpage Central School District Health and Welfare Trust Fund ("Local 237 Plainview Fund")
(together collectively the "Local 237 School District Funds") are welfare benefit plans covering
a variety of employees of the respective school districts.  The School District Funds' principal
places of business are, respectively, Brentwood, North Babylon and Plainview on Long Island.
Employees in the titles covered by the School District Funds are represented for collective
bargaining purposes by the Union.  Union members include School Aides, Cafeteria Workers,
Maintenance and Grounds Keepers, Custodial Staff.  Throughout the Class Period, Local 237
Brentwood indirectly purchased, paid, and reimbursed for generic levothyroxine intended for
consumption by its members, retirees, and their families throughout the United States, including
but not limited to New York and Puerto Rico.  Throughout the Class Period, Local 237 North
Babylon, and Local 237 Plainview indirectly purchased, paid, and reimbursed for generic
levothyroxine intended for consumption by its members, retirees, and their families throughout
the United States, including but not limited to New York.

24.      Plaintiff Teamsters Local 237 Suffolk Regional Off-Track Betting Corp. Health
and Welfare Trust Fund ("Local 237 Suffolk OTB Fund") is a welfare benefit plans covering a
variety of employees of the Suffolk OTB.  The Suffolk OTB Fund's principal place of business
is Suffolk County on Long Island.  Employees in the titles covered by the Local 237 Suffolk
OTB Fund are represented for collective bargaining purposes by the Union.  Union members

include Cashier, Security Guards, and Money Transfer Agents. Throughout the Class Period and throughout the United States, the Funds purchased, paid for, and reimbursed for generic levothyroxine intended for consumption by the Funds' members, retirees, and their families, including but not limited to New York.

25.     Plaintiff Uniformed Sanitationmen's Association Security Benefit Fund ("Uniformed Sanitation Fund") is a welfare benefit plan covering active employees of the City of New York Department of Sanitation in the title Sanitation Worker and their families. The Fund's principal place of business is 25 Cliff Street, New York, New York. Employees in the covered title are represented for collective bargaining purposes by the Uniformed Stationmen's Association, Local 831, IBT ("Local 831"). Local 831 members provide municipal sanitation services, battle snow storms and other extreme weather, enforce sanitation rules and respond to a variety of emergency situations in New York City, including the World Trade Center tragedy. Throughout the Class Period, Uniformed Sanitation Fund indirectly purchased, paid, and reimbursed for generic levothyroxine intended for consumption by its members, retirees, and their families throughout the United States, including but not limited to New York.

26.     Plaintiff Uniformed Sanitationmen's Association Retirees Welfare Fund ("Uniform Sanitation Retirees Fund") is a welfare benefit plan covering retired employees of the City of New York Department of Sanitation in the title Sanitation Worker and their families. The Fund's principal place of business is 25 Cliff Street, New York, New York. Sanitation Worker Retirees are represented for collective bargaining purposes by Local 831. Throughout the Class Period, Uniformed Sanitation Retirees Fund indirectly purchased, paid, and reimbursed for generic levothyroxine intended for consumption by its members, retirees, and their families throughout the United States, including but not limited to New York.

B.     **Defendants**

27.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  Lannett manufactures and distributes generic pharmaceuticals.  During the Class Period, Lannett sold generic levothyroxine to customers throughout the United States.

28.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan manufactures and distributes generic pharmaceuticals.  During the Class Period, Lannett sold generic levothyroxine to customers throughout the United States.

29.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz manufactures and distributes generic pharmaceuticals.  During the Class Period, Sandoz sold generic levothyroxine to customers throughout the United States.

C.     **Agents and Co-Conspirators**

30.     Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction, or control of Defendants' business or affairs.

31.     Each of the Defendants acted as the agent of, co-conspirator with, or joint venture partner of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint.

32.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and

performed acts and made statements in furtherance of the conspiracy.  Plaintiffs reserve the right

to name some or all of these persons and entities as defendants at a later date.

## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking injunctive and declaratory

relief, as well as costs of suit and attorneys' fees, for violations of the Sherman Act, 15 U.S.C.

§ 1, on behalf of the following class (the "Nationwide Injunctive Relief Class"):

> all natural persons, sole proprietorships, partnerships, limited partnerships,
> corporations, and other entities, who indirectly purchased, paid and/or reimbursed
> for generic levothyroxine intended for consumption by themselves, their families,
> or their members, participants, employees or insureds during the period from
> January 1, 2013 to the present (the "Class Period") in the United States.  Excluded
> from the class are governmental entities (except for municipalities with self-
> funded prescription drug plans), the Defendants, their co-conspirators, along with
> all of their respective parents, subsidiaries, and/or affiliates, all persons or entities
> that purchased generic levothyroxine for purposes of resale or directly from
> Defendants, "flat co-pay" consumers whose co-payment for generic levothyroxine
> remained constant regardless of the price increases herein alleged, and any and all
> jurors, judges, and justices assigned to hear any aspect of this litigation.

34.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking injunctive and declaratory

relief, costs of suit and attorneys' fees, and damages, on behalf of themselves and class members

residing in states that provide a damages remedy for indirect purchasers (the "Indirect Purchaser

States"[1]), on behalf of the following class (the "Damages Class"):

> all natural persons, sole proprietorships, partnerships, limited partnerships,
> corporations, and other entities, who indirectly purchased, paid and/or reimbursed
> for generic levothyroxine intended for consumption by themselves, their families,
> or their members, participants, employees or insureds during the period from
> January 1, 2013 to the present (the "Class Period") in the Indirect Purchaser

---

[1] The "Indirect Purchaser States" are states that provide for a damages remedy for indirect purchasers under state antitrust laws: Alabama, Arkansas, Arizona, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin.

1343920.7

States.  Excluded from the class are governmental entities (except for municipalities with self-funded prescription drug plans), the Defendants, their co-conspirators, along with all of their respective parents, subsidiaries, and/or affiliates, all persons or entities that purchased generic levothyroxine for purposes of resale or directly from Defendants, "flat co-pay" consumers whose co-payment for generic levothyroxine remained constant regardless of the price increases herein alleged, and any and all jurors, judges, and justices assigned to hear any aspect of this litigation.

35.    The Nationwide Injunctive Relief Class and the Damages Class are collectively referred to herein as the "Classes" unless otherwise indicated.

36.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least hundreds of thousands of members in each Class.

37.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of generic levothyroxine sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state laws, as alleged in the Second through Fourth Claims for Relief;

1343920.7

(f)     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)     The effect of the alleged conspiracy on the prices of generic levothyroxine sold in the United States during the Class Period;

(h)     The appropriate injunctive and related equitable relief for the Nationwide Injunctive Relief Class; and

(i)     The appropriate class-wide measure of damages for the Damages Class.

38.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially-inflated prices for generic levothyroxine purchased indirectly from Defendants.

39.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection, and class action litigation.

40.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

41.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that

numerous individual actions would engender.  The benefits of proceeding through the class

mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any

difficulties that may arise in management of this class action.

42.     The prosecution of separate actions by individual members of the Classes would

create a risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for Defendants.

## V.    FACTUAL ALLEGATIONS

### A.    Relevant Market For Generic Levothyroxine

43.     A relevant market in this case is generic levothyroxine sold in the United States.

44.     Levothyroxine replaces a hormone (thyroxine) the body normally produces by the

thyroid gland.  Levothyroxine is a synthetic form of the thyroid hormone T4.  Levothyroxine is

the preferred treatment for hypothyroidism, a condition that afflicts approximately 10 million

Americans.  Treatment typically consists of daily consumption of an oral tablet form of

levothyroxine, with the dosage determined by factors such as body weight, age, pregnancy

status, and other factors.  Patients diagnosed with hypothyroidism will often consume a daily

dosage of levothyroxine for the rest of their lives.  Levothyroxine also treats goiters, nodular

thyroid disease, thyroid cancer, and myxedema coma.  The World Health Organization includes

levothyroxine on its core list of essential medicines.  These are medicines necessary to meet the

minimum needs for a basic health-care system.

45.     Levothyroxine was introduced in the 1950s and was marketed by many

manufacturers (for instance, in 1997, there were 37 manufacturers) as a grandfathered-in,

unapproved drug.  In 1997, the United States Food and Drug Administration ("FDA")

determined that levothyroxine oral tablets were new drugs for which drug applications needed to

be submitted and approved.  The deadline for obtaining an approved application was August 14, 2001.  Nine sponsors had submitted new drug applications by then, but only two obtained approval before the deadline.  In order to allow time for manufacturers of the approved products to ramp up production and for patients to switch drug products, the FDA permitted manufacturers that had submitted an application before that date but had not yet obtained approval to continue to market their unapproved levothyroxine products for two more years according to a distribution phase-down schedule.  As of March 2003, six new drug applications had been approved for levothyroxine tablets.

46.    Levothyroxine has been available in brand-name and generic versions.  In 2004, the FDA approved the substitution of generic levothyroxine for brand-name levothyroxine. However, bioequivalence as between brand and generic levothyroxine is controversial, and some medical organizations recommend that patients be started and maintained on either brand or generic levothyroxine, and not switched from one to the other without repeated testing to insure that hormone levels remain within normal ranges.

47.    Generic drugs have unique appeal to price-sensitive buyers.  A price-sensitive buyer will always choose the lower priced generic over an equivalent brand-name drug.

48.    Generic levothyroxine manufacturers thus do not view themselves as principally competing against brand levothyroxine manufacturers.  Instead, they mainly compete against each other.  A hypothetical monopolist of generic levothyroxine could charge prices well in excess of costs and wield significant market power.

49.    From no later than 2012 through the present, the generic levothyroxine market has had three active participants:  Lannett (with approximately 20% market share, by volume), Mylan (with approximately 60%), and Sandoz Inc. (with approximately 20%).

50.     According to NADAC data, the total sales of generic levothyroxine were approximately $166.7 million in 2012, $193.3 million in 2013, $340.7 million in 2014, and $541.3 million in 2016.

**B.      The Structure Of The Generic Levothyroxine Market Facilitated Defendants' Collusion**

51.     From at least 2013 to the present, the market structure for generic levothyroxine was highly conducive to the formation and maintenance of a price-fixing conspiracy.

52.     First, generic levothyroxine is a homogenous product.  As Lannett's CEO, Arthur Bedrosian, confirmed publicly with respect to the market for generic levothyroxine:  "we're in a commodity business, so we have to certainly make sure we're in that same venue and same area of pricing."  When products and costs are homogenous, it is much easier to form a collusive agreement because firms may simply conspire with regard to price.  In markets with highly differentiated products and production costs, by contrast, would-be conspirators must reach agreement on many other factors in order to form a cartel (for instance, adjusting prices and output to reflect varying costs and product quality).  Conspiring with respect to a single factor—price—eases formation of the cartel and aids monitoring and enforcement.  Each firm may easily confirm whether other cartel participants are adhering to the terms of the cartel.

53.     Second, the market for generic levothyroxine was, and continues to be, extraordinarily concentrated.  The commonly accepted measure of market concentration is the Herfindahl-Hirschman Index ("HHI").  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  Federal antitrust enforcement agencies consider markets in which the HHI is above 2,500 to be highly concentrated.  In merger reviews, for instance, a proposed

merger that would lead to a highly concentrated market, and an increase in the HHI of more than

200 points, creates a presumption of market power and a recognized risk of collusion. Here,

throughout the relevant period, the HHI for generic levothyroxine remained at or above

approximately 4,000—a concentration level significantly beyond what antitrust enforcement

agencies consider to be highly concentrated and vulnerable to collusion.

54.    Concentration facilitates collusion because it reduces the number of negotiating

partners and increases per-firm collusive profits. Concentration also significantly increases the

stability of a cartel. One of the primary difficulties cartels face is cheating:  each member has an

individual incentive to lower prices slightly below the cartel price to capture significant market

share. In a concentrated market, cheating is more easily prevented because each member of the

cartel may more easily monitor the others and enforce compliance. In addition, as the number of

firms in a market decreases, the probability decreases that firms have different costs and

differentiated products, which—as explained above—facilitates cartel formation and

maintenance.

55.    Third, there are significant barriers to additional competitors entering the market

for generic levothyroxine, including FDA approval, production facilities, and distribution

systems. These entry barriers made it possible for Defendants to increase price without inducing

substantial new competition from non-cartel firms. Further, as explained below, Defendants

took active steps to discourage competitors from entering, including direct communications.

56.    Fourth, the demand for generic levothyroxine was stable and predictable. The

primary use of generic levothyroxine is the treatment of hypothyroidism, which typically

requires daily consumption of levothyroxine for the remaining life of the patient. Stable demand

conditions facilitate cartel formation and maintenance because members of the cartel do not need

to constantly renegotiate agreement terms to reconcile competing and changing views about future market conditions.  Further, cartel members will more easily detect cheating.  When demand is constant and/or predictable, firms cannot blame decreasing prices on unexpected low demand, thereby increasing the ability to enforce a cartel.

57.    Fifth, pricing decisions by firms regarding generic levothyroxine are transparent, and Defendants communicated their present and future pricing decisions to each other, including in public settings such as earnings calls.  By design, each Defendant knew what the other Defendants charged for their generic levothyroxine products, and what each were going to charge in the future.  Price transparency and communications ensured that Defendants could monitor compliance with the cartel, and provided a mechanism by which each could assure the others that they would keep up their end of the bargain.

58.    Sixth, industry conferences and other in-person meetings provided opportunities for Defendants to enter into, facilitate, implement, and enforce their conspiracy.

59.    Defendants are members of the same trade association: the Generic Pharmaceutical Association ("GPhA").  Senior executives of Defendants participate actively in the GPhA.  For instance, Mylan's CEO, Heather Bresch, currently chairs GPhA's board of directors.  Peter Goldschmidt, Sandoz's U.S. President and Head of North America, is a member of GPhA's board of directors.  Representatives of Defendants met in person at GPhA meetings before and during the Class period, including on October 1-3, 2012, in Bethesda, Maryland; on February 20-22, 2013 in Orlando, Florida; and on October 28-30, 2013, in Bethesda, Maryland (a date that approximately corresponds to the first wave of massive price hikes of generic levothyroxine).  These in-person meetings provided additional opportunities to collude.  As the States allege: these trade shows "provide generic drug manufacturers . . . with ample opportunity

to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition[.]"

60.    The States allege that Mylan and other generic drug companies use other industry trade shows and customer conferences to collude, including conferences hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distributions Management Association ("HDMA," now known as the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing ("ECRM"), among others.  The States further allege: "At these various conferences and trade shows, sales representatives from many generic drug manufacturers . . . have opportunities to interact with each other and discuss their respective business and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, . . . use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information."

61.    The States also allege that sales representatives of generic drug manufacturers "get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business."  "In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as 'industry dinners.'"  "At these industry dinners, one company is usually responsible for paying for dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order."

62.     Seventh, demand for generic levothyroxine is relatively inelastic, meaning that Defendants had substantial power to increase prices without significantly reducing volume. Levothyroxine is a critical drug necessary for the functioning of a basic health system.  It is essentially the exclusive treatment for hypothyroidism, and most patients require lifelong consumption of it.  The next-best substitute for generic levothyroxine is branded levothyroxine, which costs significantly more than generic alternatives.  Generic versions of drugs typically sell for far less than the brand.  Often, generic drugs cost less than 20% of the brand price.  Here, as explained below, Defendants colluded to increase prices as much as they could.  At that point, it was—perversely—the brands that restrained the prices of the generics, rather than the reverse. Defendants' price-fixing was so successful that it completely distorted normal competitive dynamics.

**C.     Defendants Conspired To Increase Prices of Generic Levothyroxine Significantly Above Competitive Levels**

63.     Beginning in approximately 2013 and continuing to the present, Defendants formed and maintained a price-fixing cartel that included all of their generic levothyroxine products.  Senior executives of each Defendant reached agreement and monitored compliance. These executives included Lannett's CEO Arthur Bedrosian and Mylan's CEO Heather Bresch. On information and belief, those executives also included Sandoz's Peter Goldschmidt.

64.     As the following chart indicates, prices for generic levothyroxine increased significantly.  (The chart is based on NADAC data.)  Prices appear to reflect a "one-way ratchet":  prices never decreased substantially, as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.



65.     Medicaid reimbursement data breaks out price levels by manufacturer. The following charts display Defendants' Medicaid reimbursements per unit for common dosages of generic levothyroxine. These charts confirm that Defendants increased their prices in very similar fashion over time.









1343920.7







66.    These dramatic price increases were the product of an illicit understanding among Defendants.  Public statements by Defendants' CEOs manifest an agreement to increase levothyroxine prices.

67.    In Lannett's September 10, 2013 earnings call, Mr. Bedrosian was asked for his reaction to Mylan increasing the price of levothyroxine "quite significantly."  Mr. Bedrosian replied, "***You mean after I sent them the thank you note?***"  He continued:  "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.  Because Lannett tends to be active in raising prices. . . . So I'm grateful to see price increases."  During the same call, Mr. Bedrosian also provided his view on whether other firms would enter the generic levothyroxine market.  He identified two possible competitors, and stated:  "But hopefully, both companies turn out to be responsible companies and don't go into the marketplace.  ***We're seeing more responsibility on the part of all of our***

*competitors, I believe, because all of us are facing the same costs*. . . . *So I would expect that*

*all the companies are not going to behave like they have in the past.  And I suspect you're*

*going to see more price increases in the generic marketplace or certainly less price erosion in*

*the marketplace because of that.*"

68.     That same earnings call included further signals to competitors to raise their

prices, and assurances that Lannett would act "responsibly" and do the same.  Mr. Bedrosian

explained:  "I am finding a climate out there has changed dramatically and *I see more price*

*increases coming from our competing competitors than I've seen in the past.  And we're going*

*to continue to lead.  We have more price increases planned for this year within our budget.*

*And hopefully, our competitors follow suit.  If they don't, that's their issue.  But our plan is to*

*raise prices on any product that we think we can or we haven't raised a price.*"

69.     Mr. Bedrosian made similar statements in a subsequent earnings call on

November 7, 2013.  He explained that Lannett's improved performance and guidance was

substantially the result of "price increases that we've talked about previously and that have now

really hit us in a beneficial way."  Martin Galvin, Lannett's CFO, publicly confirmed that

Lannett would continue to increase prices by stating that this was "the earlier days of the

increase[.]"  Mr. Bedrosian offered further assurances that price increase would continue:  "*So*

*these price increases that are going on in the industry, I think they're going to stick for all the*

*companies.*"

70.     Next, on February 6, 2014, Mr. Bedrosian again confirmed that "price increases"

was a "primary driver[]" of Lannett's performance.  Mr. Galvin said that generic levothyroxine

was one of two "key products that are driving it from a driving our gross margin from a price

increase perspective[.]"

-27-

71.     On May 7, 2014, Mr. Bedrosian said that Lannett had increased the prices of levothyroxine by 50%, the largest of Lannett's price increases.  This increase brought the prices of levothyroxine to "roughly at 75% of the brand" price.

72.     On the August 27, 2014 earnings call, Mr. Bedrosian repeated that Lannett was pricing at 75% of the brand price, and could not increase prices any further without the brand increasing its price.  When asked about the possibility of a new competitor entering the market, Mr. Bedrosian explained:  "But we did know one case, a company in Europe that indicated they were going to get an approval and they reached out to a competitor to distribute it to them ***but we know that, that competitor turned them down.  When we called them, they denied they were even working on a product.***"  Mr. Bedrosian also said that he did not think there would be any competition on levothyroxine for the rest of the year.

73.     On November 3, 2014, Mr. Bedrosian described Mylan as "***one of those rational competitors, so we're not really expecting anything crazy from them***."  He characterized price increases as a "***rocket ship [that] is leveling off now that it's broken through the atmosphere.***"  He again described Mylan as "not [an] irrational player[], I don't see them just going out and trying to grab market share."

74.     On February 4, 2015, Mr. Bedrosian again signaled that Lannett would only increase prices further and would not compete on price.  "I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced their product by 90%.  It's because the generic marketplace has so much competition sometimes . . . .  ***We don't see that kind of behavior sustainable, and we don't see it going further into the future***.  I think you're going to find more capital pricing, more—***I'll say less competition***, in sense.  ***You won't have price wars***."

75.     Mr. Bedrosian again signaled continuing high prices on August 25, 2015. "[O]verall, I feel the price increases have been sustainable and we're going into almost the third year now with some of these increases.  So we think it's a more rational market we're in."  He also credited the following rule to his Sales Vice President—who is also a target of the DOJ investigation:  "you're smart as your dumbest competitor."

76.     On February 3, 2016, Mr. Galvin confirmed that levothyroxine was Lannett's "largest product" with gross margins "above 50%."

77.     On August 23, 2016, Mr. Bedrosian stated that price competition "usually doesn't get you to results you want.  So, I think a lot of people have learned that lesson by now."  He also described a problem of "some of the dumber newer companies [that] continue to go down that path" of competing on price.  Echoing the attitude of many price-fixers who seek to rationalize their misconduct, he equated "expertise" with raising prices, and contrasted it with "crazy behaviors" of companies who seek to gain market share by cutting prices.  Mr. Bedrosian also said that these "occasional" competitors who attempted to compete on price were fortunately "maturing in the market in realizing they need to make it profit as well[.]"

78.     Mylan's CEO, Ms. Bresch, frequently made public statements that echoed Mr. Bedrosian.  On October 25, 2012, Ms. Bresch said:  "You've heard me quarter after quarter coming and saying we weren't going to chase the bottom, that there's been ***irrational behavior*** and that we would continue to hold steady and control what we can control."  To Ms. Bresch and Mr. Bedrosian, "rational" behavior was increasing or maintaining prices, while "irrational" behavior was competing on price.

79.     Ms. Bresch also contrasted the generic drug industry's prior history of price competition with a larger understanding to avoid price competition going forward.  About four

months before Mr. Bedrosian said he would send Mylan a "thank you note" for its price increase, Ms. Bresch stated on May 2, 2013: "So I think that there was very whacked-out prices, dirt cheap, literally cheaper than dirt for some of those older products. And the bar needs to go. It needed to go up from a quality perspective, and *it needs to go up and get rebalanced from a pricing perspective.* So I think that we have certainly seen that. And I'm not—there's extremes on both ends. *But I think, overall, the bar is going up. And so that stability and that tide will go with it.* And so I see that staying, because I think people realized the detriment it did to this therapeutic category by having the dynamics in place that were."

### D.   Defendants Are Under Civil And Criminal Investigation For Price-Fixing Generic Drugs

80.     Several government enforcers, including the Antitrust Division of the United States Department of Justice ("DOJ"), are investigating Defendants and other generic drug companies regarding price-fixing of generic drugs.

81.     It has been reported that, over the summer of 2016, a generic drug company sought corporate leniency from the DOJ regarding a conspiracy to fix the prices of generic drugs. Pursuant to the DOJ's Corporate Leniency Policy, a company must confess to its participation in an unlawful conspiracy with candor and completeness, and provide full, continuing, and complete cooperation that advances the DOJ in its investigation. Thus, it appears that at least one generic drug company has already confessed to the existence of an antitrust conspiracy and its participation in it.

82.     On December 14, 2016, the DOJ brought felony charges against two former senior generic pharmaceutical executives for their roles in conspiracies to fix prices, rig bids, and allocated customers for certain generic drugs. The DOJ alleges that Jeffrey Glazer, the former CEO of Heritage Pharmaceuticals, and Jason Malek, the former president of the same company,

1343920.7

conspired to fix prices, rig bids, and allocate customers for doxycycline hyclate, an antibiotic. The DOJ also alleges that Glazer and Malek conspired to fix prices and allocate customers for glyburide, a medicine used to treat diabetes. The DOJ alleges that the "doxycycline hyclate conspiracy" began in approximately April 2013 and continued until at least December 2015. The DOJ alleges that the "glyburide conspiracy" began in approximately April 2014 and continued until at least December 2015.

83.     The DOJ's charges are the result of an ongoing DOJ investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry.

84.     At least twenty States are also conducting a thorough investigation of collusion among generic drug manufacturers, and filed suit against Mylan and others on December 14, 2016. The States have made clear that the evidence of wrongdoing they have uncovered extends far beyond the defendants and drugs identified in their "initial civil action." The Attorney General of Connecticut, George C. Jepson, whose office led the States' antitrust investigation, told the New York Times: "We believe that this is just the tip of the iceberg. I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

85.     The States allege that generic drug manufacturers, including Defendant Mylan, "routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and /or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition when in fact none existed." The States also allege that generic drug manufacturers, including Defendant Mylan, "routinely and as part of their regular course of business, sought and obtained agreements with competitors to fix and raise prices."

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
**(On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class Against All Defendants)**

86.     Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

87.     Beginning as early as 2013 and continuing through the present, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their unnamed co-conspirators entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

88.     In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of generic levothyroxine.

89.     As a result of Defendants' unlawful conduct, prices for generic levothyroxine were raised, fixed, maintained, and stabilized in the United States.

90.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

91.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to:  (1) agreeing to raise, fix, and maintain prices for generic levothyroxine; (2) raising, fixing, and maintaining prices for generic levothyroxine; and (3) selling generic levothyroxine throughout the United States at inflated prices.

92.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Nationwide Injunctive Relief Class who purchased generic levothyroxine have been injured

in that they have paid more for generic levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct.

93.    Defendants' alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

94.    Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

95.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## <u>SECOND CLAIM FOR RELIEF</u>

**VIOLATION OF STATE ANTITRUST LAWS**
**(On Behalf of Plaintiffs and the Damages Class Against All Defendants)**

96.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

97.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic levothyroxine in unreasonable restraint of trade and in violation of the following state statues.

98.    <u>Alabama</u>:  By reason of the foregoing, Defendants have violated Alabama Code § 6-5-60.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Alabama; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and members of the Damages Class

1343920.7

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected

Alabama commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in

restraint of trade in violation of Alabama Code § 6-5-60.  Accordingly, Plaintiffs and members

of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60.

99.     Arizona:  By reason of the foregoing, Defendants have violated Arizona Revised

Statutes, §§ 44-1401, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price

competition for generic levothyroxine was restrained, suppressed, and eliminated throughout

Arizona; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at

artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected

Arizona commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

1343920.7

d.       By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes, §§ 44-1401, *et seq*.

100.     <u>California</u>:  By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.       Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected mainly within the State of California, and Defendants' conduct within California injured all members of the class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of the Damages Class.

b.       Beginning at a time currently unknown to Plaintiffs, but at least as early as 2013, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation California Business and Professions Code § 16720.  Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic levothyroxine at supra-competitive levels.

c.       The aforesaid violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic levothyroxine.

d.       For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired

1343920.7

to do, including but not in any way limited to the acts, practices and course of conduct set forth above and fixing, raising, stabilizing, and pegging the price of generic levothyroxine.

e.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of generic levothyroxine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic levothyroxine have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased generic levothyroxine directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

f.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property in that they paid more for generic levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of California Business and Professions Code § 16720, Plaintiffs and the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

101.    <u>District of Columbia</u>:  By reason of the foregoing, Defendants have violated District of Columbia Code, §§ 28-4501, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and

members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic levothyroxine that was shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic levothyroxine that was shipped by Defendants or their co-conspirators, paid supra-competitive, artificially-inflated prices for generic levothyroxine, including in the District of Columbia.

        b.      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of District of Columbia Code, §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code, §§ 28-4501, *et seq*.

102.    <u>Illinois</u>: By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

        a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Illinois; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

paid supra-competitive, artificially-inflated prices for generic levothyroxine.

        b.      During the Class Period, Defendants' illegal conduct substantially affected

Illinois commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

        d.      By reason of the foregoing, Defendants entered into agreements in

restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et

seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available

under the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

    103.   <u>Iowa</u>:  By reason of the foregoing, Defendants have violated Iowa Code,

§§ 553.1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

        a.      Defendants' combination or conspiracy had the following effects: (1) price

competition for generic levothyroxine was restrained, suppressed, and eliminated throughout

Iowa; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at

artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

paid supra-competitive, artificially-inflated prices for generic levothyroxine.

        b.      During the Class Period, Defendants' illegal conduct substantially affected

Iowa commerce.

1343920.7

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code, §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code, §§ 553.1, *et seq.*

104.    <u>Kansas</u>:  By reason of the foregoing, Defendants have violated Kansas Statutes, §§ 50-101, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Kansas; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Kansas Statutes, §§ 50-101, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Kansas Statutes, §§ 50-101, *et seq*.

105.    <u>Maine</u>:  By reason of the foregoing, Defendants have violated Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Maine; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.

106.    <u>Michigan</u>:  By reason of the foregoing, Defendants have violated Michigan Compiled Laws, §§ 445.771, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

1343920.7

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Michigan; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Michigan Compiled Laws, §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Michigan Compiled Laws, §§ 445.771, *et seq*.

107.    <u>Minnesota</u>:  By reason of the foregoing, Defendants have violated Minnesota Statutes, §§ 325D.49, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

1343920.7

b.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Minnesota Statutes, §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Minnesota Statutes, §§ 325D.49, *et seq*.

108.    <u>Mississippi</u>:  By reason of the foregoing, Defendants have violated Mississippi Code, §§ 75-21-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1343920.7

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Mississippi Code, §§ 75-21-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mississippi Code, §§ 75-21-1, *et seq*.

109.    Nebraska:  By reason of the foregoing, Defendants have violated Nebraska Revised Statutes, §§ 59-801, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nebraska Revised Statutes, §§ 59-801, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nebraska Revised Statutes, §§ 59-801, *et seq*.

110.    Nevada:  By reason of the foregoing, Defendants have violated Nevada Revised Statutes, §§ 598A.010, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Nevada; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nevada Revised Statutes, §§ 598A.010, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nevada Revised Statutes, §§ 598A.010, *et seq*.

111.    <u>New Hampshire</u>:  By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes, §§ 356:1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

      b.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes, §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Hampshire Revised Statutes, §§ 356:1, *et seq*.

112.   <u>New Mexico</u>:  By reason of the foregoing, Defendants have violated New Mexico Statutes, §§ 57-1-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

      a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

      b.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Mexico Statutes, §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Mexico Statutes, §§ 57-1-1, *et seq.*

113.    <u>New York</u>:  By reason of the foregoing, Defendants have violated New York General Business Laws, §§ 340, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout New York; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New York General Business Laws, §§ 340, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all forms of relief available under New York General Business Laws, §§ 340, *et seq.*

114.    <u>North Carolina</u>:  By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

        a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

        b.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

        c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Carolina General Statutes, §§ 75-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Carolina General Statutes, §§ 75-1, *et seq.*

115.    <u>North Dakota</u>:  By reason of the foregoing, Defendants have violated North Dakota Century Code, §§ 51-08.1-01, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Dakota Century Code, §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Dakota Century Code, §§ 51-08.1-01, *et seq*.

116.    Oregon:  By reason of the foregoing, Defendants have violated Oregon Revised Statutes, §§ 646.705, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Oregon; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

1343920.7

b.     During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Oregon Revised Statutes, §§ 646.705, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Oregon Revised Statutes, §§ 646.705, *et seq*.

117.     <u>South Dakota</u>:  By reason of the foregoing, Defendants have violated South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.     During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1343920.7

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*

118.    <u>Tennessee</u>:  By reason of the foregoing, Defendants have violated Tennessee Code, §§ 47-25-101, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Tennessee Code, §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Tennessee Code, §§ 47-25-101, *et seq.*

119.    <u>Vermont</u>:  By reason of the foregoing, Defendants have violated Vermont Statutes, 9 V.S. §§ 2453, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Vermont Statutes, 9 V.S. §§ 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Vermont Statutes, 9 V.S. §§ 2453, *et seq.*

120.    <u>West Virginia</u>:  By reason of the foregoing, Defendants have violated West Virginia Code, §§ 47-18-1, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

-51-

b.      During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of West Virginia Code, §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under West Virginia Code, §§ 47-18-1, *et seq*.

121.    <u>Wisconsin</u>:  By reason of the foregoing, Defendants have violated Wisconsin Statutes, §§ 133.01*, et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1343920.7

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Wisconsin Statutes, §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Wisconsin Statutes, §§ 133.01, *et seq.*

## THIRD CLAIM FOR RELIEF

### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(On Behalf of Plaintiffs and the Damages Class Against All Defendants)**

122.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

123.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

124.    <u>Arkansas:</u>  By reason of the foregoing, Defendants have violated the Arkansas Deceptive Trade Practices Act, Arkansas Code, §§ 4-88-101, *et. seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic levothyroxine was sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  This conduct on the part of the Defendants constituted "deceptive" and "unconscionable" acts or practices in violation of Arkansas Code, § 4-88-107(a)(10).

b.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Arkansas; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at

1343920.7

artificially high levels throughout Arkansas; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

      c.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

      e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code, §§ 4-88-101, *et. seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

125.   <u>California:</u>  By reason of the foregoing, Defendants have violated California's Unfair Competition Law, California Business and Professions Code, §§ 17200, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

      a.      Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of generic levothyroxine as described above.

      b.      The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of Section 17200, *et seq.*, including, but not limited to:  (1) violations of Section 1 of the Sherman Act, as set forth above; and (2) violations of the Cartwright Act, California Business and Professions Code, §§ 16720, *et seq.*, as set forth above.

1343920.7

c.      Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq*.

e.      Defendants' conduct was carried out, effectuated, and perfected within the State of California.  Defendants maintained offices in California where their employees engaged in communications, meetings, and other activities in furtherance of Defendants' conspiracy.

f.      By reason of the foregoing, Plaintiffs and the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Business and Professions Code, §§ 17200, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

126.    <u>Florida:</u>  By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Florida Statues, §§ 501.201, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Florida; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Statutes, §§ 501.201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

127.    Montana:  By reason of the foregoing, Defendants have violated the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Montana Code, §§ 30-14-101, *et seq.* and §§ 30-14-201, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Montana; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants marketed, sold, or distributed generic levothyroxine in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code, §§ 30-14-101, *et seq*. and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

128.    <u>Nebraska:</u>  By reason of the foregoing, Defendants have violated Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' unlawful conduct had the following effects: (1) generic levothyroxine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

b.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq*., and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

129.    <u>New Mexico:</u>  By reason of the foregoing, Defendants have violated the New

Mexico Unfair Practices Act, New Mexico Statutes, § 57-12-1, *et seq*.  Plaintiffs on behalf of the

Damages Class allege as follows:

a.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain,

at artificial and non-competitive levels, the prices at which generic levothyroxine was sold,

distributed, or obtained in New Mexico.  Defendants took efforts to conceal their agreements

from Plaintiffs and members of the Damages Class.  This conduct on the part of the Defendants

constituted "unfair or deceptive trade practices and unconscionable trade practices" in violation

of New Mexico Statutes, § 57-12-3.

b.    Defendants and their co-conspirators possessed the sole power to set

prices of generic levothyroxine, and used this power to conceal their price-fixing conspiracy

from Plaintiffs and members of the Damages Class.  Defendants took advantage of Plaintiffs's

and members of the Damages Class' lack of knowledge to a grossly unfair degree, within the

meaning of New Mexico Statutes, § 57-12-2(E).

c.    Defendants' unlawful conduct had the following effects: (1) price

competition for generic levothyroxine was restrained, suppressed, and eliminated throughout

New Mexico; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized

at artificially high levels throughout New Mexico; (3) Plaintiffs and the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-

competitive, artificially-inflated prices for generic levothyroxine.

d.    During the Class Period, Defendants' illegal conduct substantially

affected New Mexico commerce and consumers.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes, § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

130.     <u>New York:</u>  By reason of the foregoing, Defendants have violated New York General Business Laws, § 349, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which generic levothyroxine was sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the Damages Class.

b.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of New York General Business Laws, § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c.     Defendants made certain statements about generic levothyroxine that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for generic levothyroxine.

d.     Defendants' unlawful conduct had the following effects: (1) generic levothyroxine price competition was restrained, suppressed, and eliminated throughout New

York; (2) generic levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

e.       During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

f.       During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic levothyroxine in New York.

g.       Plaintiffs and members of the Damages Class seek all relief available pursuant to New York General Business Laws, § 349(h).

131.    North Carolina:   By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1.1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.       Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic levothyroxine was sold, distributed, or obtained in North Carolina.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  Defendants and their co-conspirators possessed the sole power to set prices of generic levothyroxine, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic levothyroxine.

1343920.7

      b.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

      c.      During the Class Period, Defendants marketed, sold, or distributed generic levothyroxine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

      e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina General Statutes, §§ 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

132.    <u>South Carolina:</u>  By reason of the foregoing, Defendants have violated the South Carolina Unfair Trade Practices Act, South Carolina Code, §§ 39-5-10, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

      a.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout South Carolina; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic levothyroxine.

1343920.7

b.      During the Class Period, Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code, §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

133.    <u>Vermont:</u>  By reason of the foregoing, Defendants have violated the Vermont Consumer Protection Act, 9 Vermont Statutes, §§ 2453, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic levothyroxine was sold, distributed, or obtained in Vermont.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class, including through affirmative misrepresentations and omissions of information important to Plaintiffs and members of the Damages Class.

b.      Defendants and their co-conspirators possessed the sole power to set prices of generic levothyroxine, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic levothyroxine.

c.      Defendants' unlawful conduct had the following effects: (1) price competition for generic levothyroxine was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic levothyroxine were raised, fixed, maintained, and stabilized at

artificially high levels throughout Vermont; (3) Plaintiffs and the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive,

artificially-inflated prices for generic levothyroxine.

        d.      During the Class Period, Defendants' illegal conduct substantially

affected Vermont commerce and consumers.

        e.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and the Damages Class have been injured and are threatened with further injury.

        f.      Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of 9 Vermont Statutes, §§ 2453, *et seq.*, and, accordingly, Plaintiffs

and the Damages Class seek all relief available under that statute.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Damages Class Against All Defendants)**

134.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the

paragraphs set forth above.

135.    As a result of their unlawful conduct described above, Defendants have and will

continue to be unjustly enriched by the receipt of unlawfully and artificially-inflated prices for

generic levothyroxine.

136.    Defendants have benefited from their unlawful conduct described above.  It would

be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from

the overpayments made by Plaintiffs and members of the Damages Class for generic

levothyroxine manufactured by Defendants during the Class Period.

137.    Plaintiffs and members of the Damages Class are entitled to the amount of

Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

Plaintiffs and members of the Damages Class are therefore entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes pray for relief as set forth below:

1.      Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and Plaintiffs' proposed class counsel as Class Counsel;

2.      A declaration that Defendants' conduct constituted:  (1) an unlawful restraint of trade in violation of the federal and state statutes cited herein; (2) unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes cited herein; and (3) acts of unjust enrichment;

3.      Restitution and/or damages to members of the Damages Class for their purchases of generic levothyroxine at inflated prices;

4.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

5.      Pre-judgment and post-judgment interest on such monetary relief;

6.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

7.      An injunction against Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar

purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

       8.     The costs of bringing this suit, including reasonable attorneys' fees; and

       9.     All other relief to which Plaintiffs and members of the Classes may be entitled at law or in equity.

## VII.   <u>JURY DEMAND</u>

Plaintiffs hereby request a jury trial on any and all claims so triable.

Dated: April 5, 2017                  Respectfully submitted,

<div style="margin-left:40%">

By:    */s/ Brendan P. Glackin*
_____

Elizabeth J. Cabraser (Pro Hac Vice forthcoming)
Richard M. Heimann (RH 9373)
Eric B. Fastiff (Pro Hac Vice forthcoming)
Brendan P. Glackin (BG 7314)
Dean M. Harvey (Pro Hac Vice forthcoming)
Bruce W. Leppla (BL 6383)
Michelle A. Lamy (Pro Hac Vice forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:   (415) 956-1000
Facsimile:    (415) 956-1008
Email: ecabraser@lchb.com
Email: rheimann@lchb.com
Email: efastiff@lchb.com
Email: bglackin@lchb.com
Email: dharvey@lchb.com
Email: bleppla@lchb.com
Email: mlamy@lchb.com

Daniel E. Seltz (DS 0837)
Annika K. Martin (AM 2972)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:   (212) 355-9500

</div>

1343920.7

Facsimile:    (212) 355-9502
Email:  dseltz@lchb.com
Email: amartin@lchb.com


Dan Drachler (DD 1526)
Robert S. Schachter (RS 7243)
Joseph Lipofsky (JL 0971)
Sona Shah (SS 4712)
ZWERLING SCHACHTER &
ZWERLING, LLP
41 Madison Ave.
New York, NY 10010
Telephone: (212) 223-3900
Facsimile:  (212) 371-5969
Email: ddrachler@zsz.com
Email: rschacter@zsz.com
Email: jlipofsky@zsz.com
Email: sshah@zsz.com

*Attorneys for Plaintiffs and the proposed Class*